**COMMONWEALTH of Pennsylvania,**
**Appellee**

v.

**Jamiel JOHNSON, Appellant.**

Superior Court of Pennsylvania.

Submitted Nov. 6, 2006.

Filed March 7, 2007.

*Yee,* 878 A.2d at 913–914.

Lee Mandell, Philadelphia, for appellant.

Hugh J. Burns, Jr., Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: JOYCE, LALLY–GREEN, JOHNSON, JJ.

OPINION BY LALLY–GREEN, J.:

¶ 1 Appellant, Jamiel Johnson, appeals from the trial court's November 2, 2005 judgment of sentence. We affirm.

¶ 2 The trial court recited the procedural history and found the following facts:

On March 16, 2004, Jamiel Johnson, (hereinafter "defendant") was arrested and charged on August Term, 2004, Bill No. 154. The Commonwealth proceeded on charges of murder in the first degree, murder in the third degree and possessing instruments of crime. At trial, prior to closing arguments, defense counsel requested the charge of voluntary manslaughter. On September 21, 2005, the defendant was tried by a jury and found guilty of murder in the first degree and possessing instruments of crime. On November 2, 2005, the defendant was sentenced to life in prison without parole on the charge of murder in the first degree and 11–48 months on the charge of possessing instruments of crime. All sentences to run concurrent to each other. Post sentence motions were denied.

**Facts**

On August 24, 2003, [at] approximately 9:30 p.m., Harrison Wiggins, a/k/a/ Slim, the decedent, (hereinafter "Harrison") went to a crack house located on 1206 South 57th Street, Philadelphia, owned by Dana Wallace (hereinafter "Dana"). The defendant arrived at Dana's house shortly after Harrison. Dana, Geraldine Brooks (hereinafter "Geraldine"), Wanda Ibrahim (hereinafter "Wanda"), Jason, Jerome, Crystal and Angelo were all present in the house when the defendant arrived.

At approximately 4:30 a.m., Dana and Geraldine left the house to buy drugs. At that time, Jerome and Wanda were upstairs in the back room, Jason and a young lady were in another bedroom,

Crystal and Angelo were in another bedroom, Harrison was downstairs in the dining room and the defendant was sitting on a couch in the living room.

Shortly after Dana left, Jerome went to buy drugs. Wanda, who remained upstairs in the back bedroom, overheard an argument and heard somebody say, "look, you got to leave," and another person responded "Dana said I could stay." Then the other voice again said, "look, you got to go now." Then the person said, "If you keep bothering me I'm going to cut your fucking head off." Within a couple of minutes, Wanda heard what sounded like the furniture being bumped around followed by the sound of glass breaking.

Immediately thereafter, Dana and Geraldine returned to the house to find the front door locked. Dana banged on the door and after five to ten minutes of banging on the door, the defendant opened the door. Dana and Geraldine entered the house and the defendant asked Dana to call 911 and asked for an ambulance, but not the police. He then stated "I think I killed Old Head."

At that point, Wanda made her way downstairs and on her way out the door she observed the defendant standing in the middle of the living room and Harrison in the dining room with one leg extended straight out, the other bent with his hands on his head moaning and moving from side to side. Harrison was completely saturated in blood almost down to his waist. Dana left the living room, went upstairs, and when he returned downstairs the defendant was gone.

Officer Milligan testified that at approximately 6:26 a.m. he arrived at 1206 South 57th Street, Philadelphia. Upon entering the house he observed Harrison lying on the floor in the dining room covered in a large amount of blood. Officer Milligan noticed broken glass all over the floor near Harrison's body and a piece of glass wrapped in a rag in a corner. At that time, Officer Milligan sent all of the individuals in the house outside where they were detained by Officer Singleton, another officer who had arrived on the scene. Officer Toughill, who arrived on the scene at approximately 6:30 a.m., questioned the individuals who had been in the house. After speaking with the witnesses, Officer Toughill learned that the suspect was a black male named Jamiel wearing a black doo rag, black shirt and black pants. He also learned that a female wearing a red jacket left the scene. At that point, Officer Toughill looked down Thomas Avenue and saw a woman fitting that description. The woman was brought back to the scene for questioning and identified as Wanda Ibrahim.

Officer Tagget photographed the crime scene and recovered a roll of toilet paper with a red stain found in the bathroom, a door handle with a red stain removed from the interior side of the front storm door, three pieces of mirror with a red stain found in the dining room and several other items. The items found in Dana's house were transmitted to the Criminalistics Laboratory for analysis. Latent prints were lifted from a red stained piece of mirror found in the dining room. The prints were determined to be the defendant's fingerprints. The results of the Criminalistics analysis revealed the defendant's DNA was on the piece of toilet paper and a swab of stain taken from the door handle.

Harrison was pronounced dead at 7:28 a.m. at the Hospital of the University of Pennsylvania. Doctor Ian Hood, the medical examiner, testified that Harrison died from multiple stab and slash

wounds and the manner of death was homicide. He testified that seven slash wounds were about the forehead, face and cheeks and one stab wound was in the right side of the neck which severed the jugular vein. Harrison also had several small scratches and superficial incised wounds about the neck, back, shoulders, upper arm and his right thumb. Dr. Hood testified that [those] wounds are consistent with an implement such as [a] shard of glass rather than a knife.

An arrest warrant was issued for the defendant and the police made several attempts to apprehend the defendant in Philadelphia. The defendant was not apprehended until February 29, 2004, in Memphis, Tennessee. At trial, the defendant testified that four days before the murder he went to Memphis, Tennessee and was not in Philadelphia at the time of the murder. He also testified that he learned of the murder from family members who told him that he was accused of committing the murder.

Trial Court Opinion, 6/9/06, at 1–4 (record citations omitted).

¶ 3 Appellant raises the following issues for our review:

I. Should the Defendant be awarded an arrest of judgment on the charge of Murder in the First Degree where the Commonwealth did not prove beyond a reasonable doubt or through sufficient evidence, that the Defendant was guilty of Murder in the First Degree?

II. Should the Defendant be awarded a new trial as the result of a *[Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] violation wherein the Commonwealth failed to produce exculpatory evidence in the form of three separate mental health reports known by the Commonwealth to exist prior to trial and where those reports in and of themselves or through further investigation would have led to a mental health defense?

III. Should the Defendant be awarded a new trial where the Court, in error, ruled that the Defendant was competent to proceed with trial where the evidence of record would have revealed otherwise?

Appellant's Brief at 3.

■ ¶ 4 Before we address the merits of this appeal, we must determine whether Appellant has complied with Rule 1925(b) of the Rules of Appellate Procedure. In its denial of Appellant's post-sentence motions, the trial court directed that, in the event of an appeal, Appellant should file a concise statement of matters complained of within 14 days of the filing of the notice of appeal. The docket reflects that Appellant filed a notice of appeal on March 3, 2006 and did not file a concise statement until April 10, 2006. Appellant, therefore, did not comply with the trial court's order.

■ ¶ 5 We note, however, that Rule 1925 contemplates that the trial court will be in receipt of a notice of appeal before initiating the Rule 1925 process. *See* Pa. R.A.P.1925(a) ("**General Rule.** Upon receipt of the notice of appeal . . . ."). Furthermore, the clerk of courts has a mandatory duty to serve orders, including 1925(b) orders, on parties and to record in the docket the time and manner of service. *Commonwealth v. Hess,* 570 Pa. 610, 810 A.2d 1249, 1252–1254 (2001), *citing* Pa. R.Crim.P. 114. Since the trial court entered its 1925(b) order prior to receipt of the notice of appeal, and since the docket does not reflect the time and manner of service of that order, we cannot conclude that Appellant has waived his issues for failure to comply with Rule 1925. *Hess.*

¶ 6 With regard to the merits of Appellant's issues, we have reviewed the trial

court opinion, the parties' briefs, the record, and the applicable law. We conclude that the trial court's well-reasoned opinion aptly addresses each of Appellant's issues. Accordingly, we affirm the judgment of sentence on the basis of the trial court's opinion.

¶ 7 Judgment of sentence affirmed.